**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
& FILED
2018 SEP -6 A 9:55

DEPUTY CLERK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: HISTORICAL INFORAMTION ASSOCIATED WITH SNAPCHAT USERNAME "RARRIROSE26" THAT IS STORED AT PREMISES CONTROLLED BY SNAP, INC | No. 2:18-mj-289-JHR |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Ryan Guay, being duly deposed and sworn, state as follows:

1.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Deputy United States Marshal ("DUSM") with the United States Marshals Service ("USMS") and have been employed by the USMS since September 2010. I have received extensive training in criminal investigations. I have graduated from the Criminal Investigators Training Academy and United States Marshals Service Basic Training Class. Both are located at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received additional training in various areas of law enforcement, including the apprehension of fugitives. My current primary assignments are the apprehension of fugitives, court assignments, prisoner transports, and judicial security. I have worked on numerous successful investigations of fugitives from this Court and also in conjunction with members of the Drug Enforcement Administration ("DEA"). I have prepared numerous affidavits in support of applications for federal search warrants and pen register authorizations.

2. As a DUSM, I am empowered by law to conduct investigations and to make arrests for federal felony offenses. I am a participating member of the Maine Violent Offender Task Force (MVOTF), which is comprised of personnel from the Maine State Police, Biddeford Police Department, Lewiston Police Department, U.S. Department of Homeland Security, Diplomatic Security Service and Immigration and Customs Enforcement.

3. I make this affidavit in support of a search warrant for historical content for Snapchat account assigned user name "rarrirose26" ("the Target Snapchat Account"). The requested historical information is set forth in Attachment B to the search warrant application.

4. I base this affidavit on: (a) my personal knowledge and involvement in this investigation; (b) my review of telephone, social media, and other records related to Andrew Waite; (c) information provided to me by USMS and DEA investigators; and (d) my experience and training as a criminal investigator.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment B will constitute or lead to evidence of the offenses of harboring a fugitive, in violation of Title 18, United States Code, Section 1071, and accessory after the fact, in violation of Title 18, United States Code, Section 3.

## JURISDICTION

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.  I adopt and incorporate my affidavit attached as Exhibit 1.

8.  Andrew Waite was a fugitive from justice from the time this Court issued an arrest warrant on February 28, 2018, until his arrest in Charlotte, North Carolina, on July 18, 2018. I am currently investigating people who may have assisted Waite in avoiding apprehension.

9.  Following the issuance of the arrest warrant for Waite, law enforcement's efforts to locate and apprehend Waite met with negative results for nearly five months. During the fugitive investigation, law enforcement made repeated contacts with members of Waite's family in an effort to secure his surrender. These efforts were unsuccessful.

10. Waite was ultimately arrested at a hotel in Charlotte. At the time of his arrest, he was in possession of a cellular telephone, approximately $25,000 in United States currency, and marijuana concentrate.

11. Following Waite's arrest, I was contacted by an attorney representing a person referred to hereinafter as Confidential Source 1 ("CS-1"). CS-1 participated in a meeting with law enforcement pursuant to the standard proffer agreement protections. In summary and in part, CS-1 stated the following:

   a. CS-1 met Andrew Waite in Florida;

   b. CS-1 rented an apartment in Florida;

   c. Waite often stayed in this apartment;

   d. Waite's girlfriend, Katelynn, visited Waite in Florida;

   e. Waite also had other visitors;

   f. CS-1 was unaware that Waite was a fugitive from justice until he/she learned

Waite had been arrested;

    g. CS-1 has since vacated the apartment and moved out of Florida.

12. Following Waite's arrest, CS-1 received communications over Snapchat from Waite's girlfriend Katelynn. CS-1 told me that Katelynn uses the Target Snapchat Account.

13. Among the communications received by CS-1 from the Target Snapchat Account was a photograph of a handwritten letter, which CS-1 understood was authored by Waite and transmitted to CS-1 by Farrar. This letter requests that CS-1 return to Florida to assist with collection of items Waite left behind. A copy of the letter is shown below:



14. CS-1 told me that he/she also had a telephone call with Waite while Waite was in custody. CS-1 indicated that Waite wanted CS-1 to go back to the apartment and obtain certain items for him.

15. CS-1 received additional communications from the Target Snapchat Account about travel to Florida. CS-1 sent me screenshots of these messages. I believe these additional messages relate to CS-1's travel to Florida at the direction of Waite.

16. Following receipt of the letter shown above, CS-1 provided consent for law

5

enforcement to search the Florida apartment. During the search, law enforcement seized approximately $15,000 in United States currency concealed in the bed frame consistent with Waite's description in the letter. Based on the ongoing investigation, I believe this money represents proceeds of drug trafficking.

17. I believe Waite is unaware that law enforcement searched this apartment. At present, Waite's brother, Aaron, is attempting to make arrangements for CS-1 to travel to Florida to retrieve Andrew Waite's belongings. I learned from CS-1's attorney that Aaron Waite in fact purchased an airline ticket for CS-1 to travel to Miami on September 9, 2018. I obtained a copy of the travel receipt showing CS-1's reservation. Communications between CS-1 and Aaron Waite about this trip occurred as recently as September 5, 2018.

18. I believe that Farrar used the Target Snapchat Account to communicate with CS-1 and others about recovery of Waite's money. I also believe that there is probable cause that Farrar used this account to communicate with Waite and others while Waite was a fugitive. I believe based on the information set forth above and in Exhibit 1, that Farrar is an active user of social media. I therefore believe Snap, Inc., has in its possession evidence of the offenses of accessory after the fact and/or harboring a fugitive.

## INFORMATION ABOUT SNAPCHAT

19. Based upon information from other law enforcement officers and publicly available information, I know the following about Snapchat:

a. Snap, Inc., is headquartered in Venice, California, and owns and operates a free access social networking website of the same name that can be accessed at http://www.snapchat.com. Snapchat is one of the most popular applications for sending and receiving 'self-destructing' messages, pictures, and videos. Referred to as 'snaps', the company

processes approximately 700 million of them every day on Apple's iOS and Google's Android operating systems. Snapchat users access the application frequently. According to marketing material provided by the company, the average Snapchat user checks their account 14 times a day.

  b. A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitutes "electronic communications" within the meaning of 18 U.S.C. § 3123. See 18 U.S.C. §§ 3127(1) and 2510(12).

  c. "Our Stories" is a collection of user submitted "Snaps" from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a rave could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories", a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can

7

be viewed either by everyone on Snapchat or just the user's friends. Stories are visible to other users for up to 24 hours.

  d. In addition to photos, videos, "Snaps" and stories, "Snapcash" is an online money transfer service offered by Snapchat. The actual business platform is run by "SquareUp", the distributor of a mobile credit card reader and application Square Register. Snapcash can be used to transfer money between Snapchat users using a linked, U.S. issued Visa or MasterCard debit card only; using credit cards is not permitted. Snapcash can only be sent to other users who have a linked debit card. Snapcash has a $250 weekly limit but can be upgraded to a $2,500 weekly limit. Users who upgrade have to provide their full name, date of birth, and Social Security number.

  e. While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

  f. Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account they make a unique Snapchat username. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, a user may elect to bypass

entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

    g.    Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

### IV. Information to be Searched and Seized

20.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Snapchat to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

21.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of Title 18, United States Code, Section 1071 (harboring a fugitive), and Title 18, United States Code, Section 3 (accessory after the fact) may be located in the Target Snapchat Account described in Attachment A of the search warrant application.

22. Based on the forgoing, I request that the Court issue the proposed search warrant.

23. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Because this warrant will be served on Snap, Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

_____
Ryan Guay
Deputy United States Marshal
United States Marshals Service

Signed and sworn to before me this 6th day of September, 2018, at Portland, Maine

_____
John H. Rich III
United States Magistrate Judge
District of Maine

10

## ATTACHMENT A

### Property to Be Searched

Information associated with the Snapchat profile with username: **rarrirose26** that is stored at premises owned, maintained, controlled, or operated by Snap, Inc., a company that is located at 63 Market Street, Venice, California, 90291.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be disclosed by Snap, Inc.

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap, Inc., including any messages, videos, photos, records, files, logs, or information that have been deleted but are still available to Snap, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Snap, Inc. is required to disclose the following information to the government for each account listed in Attachment A:

a. All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b. All past and current usernames associated with the account;

c. The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d. All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

e. All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f. All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

g. All communications or other messages (to include videos and photos) sent or received by the account from March 1, 2018, to September 6, 2018;

h. All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content from March 1, 2018, to September 6, 2018;

i. All photographs and images in the user gallery for the account from March 1, 2018, to September 6, 2018;

j. All location data associated with the account, including from March 1, 2018, to September 6, 2018;

    k.    All data and information that has been deleted by the user from March 1, 2018, to September 6, 2018;

    l.    A list of all users that the account has "unfollowed" or blocked;

    m.    All privacy and account settings;

    n.    All records of searches performed by the account, including all past searches saved by the account from March 1, 2018, to September 6, 2018;

    o.    All information about connections between the account and third-party websites and applications; and,

    p.    All records pertaining to communications between Snap, Inc., and any person regarding the user or the user's Snapchat account, including contacts with support services, and all records of actions taken, including suspensions of the account.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1071 (harboring a fugitive) and 3 (accessory after the fact) involving Andrew WAITE and/or Kaitlyn FARRAR March 1, 2018, to September 6, 2018, including information pertaining to the following matters:

(a) Evidence related to Waite's attempts to avoid arrest, locations, contacts, and other activities since February 27, 2018, that are evidence of his whereabouts, activities, and efforts to avoid arrest;

(b) Evidence related to all efforts made by Farrar and any other people to assist Waite in avoiding capture, including, but not limited to, financial support, residential support, assistance with means of communication, and any other actions designed to aid Waite;

(c) Evidence of Farrar's location between February 27, 2018, and July 18, 2018;

(d) Evidence of efforts to recover Waite's money or property that represents proceeds of drug trafficking and/or money laundering;

2

(e) Evidence indicating how and when the Snapchat account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Snapchat account owner;

(f) Evidence indicating the Snapchat account owner's state of mind as it relates to the crimes under investigation;

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(h) The identity of the person(s) who communicated with the user ID about Waite's fugitive status, including records that help reveal their whereabouts.